1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM JOSEPH BROWN,

11              Petitioner,                    No. 2: 09-cv-0774 KJN P

12        vs.

13   R. BARNES,

14              Respondent.              ORDER

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  Both petitioner and respondent have consented to

19   the jurisdiction of the undersigned.  (Dkt. Nos. 4, 15.)

20              Petitioner challenges his 2006 conviction for assault (Cal. Penal Code § 240))

21   (count one), false imprisonment (Cal. Penal Code § 236) (count three), assault by means of force

22   likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)) (count five), two counts of

23   criminal threats (Cal. Penal Code § 422) (counts six and seven), and inflicting great bodily injury

24   under circumstances involving domestic violence (Cal. Penal Code § 12022.7(e)) in the

25   commission of count five.  Petitioner is serving a sentence of 17 years and 4 months.

26   ////

1    The petition raises the following claims: prosecutorial misconduct (2 claims); and

2    insufficient evidence.

3    After carefully considering the record, the undersigned orders the petition denied.

4    II.  Standards for a Writ of Habeas Corpus

5    An application for a writ of habeas corpus by a person in custody under a

6    judgment of a state court can be granted only for violations of the Constitution or laws of the

7    United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

8    interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

9    Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

10    Federal habeas corpus relief is not available for any claim decided on the merits in

11    state court proceedings unless the state court's adjudication of the claim:

12    (1) resulted in a decision that was contrary to, or involved an
      unreasonable application of, clearly established Federal law, as
13    determined by the Supreme Court of the United States; or

14    (2) resulted in a decision that was based on an unreasonable
      determination of the facts in light of the evidence presented in the
15    State court proceeding.

16    28 U.S.C. § 2254(d).

17    Under section 2254(d)(1), a state court decision is "contrary to" clearly

18    established United States Supreme Court precedents if it applies a rule that contradicts the

19    governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

20    indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

21    result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06

22    (2000)).

23    Under the  "unreasonable application" clause of section 2254(d)(1), a federal

24    habeas court may grant the writ if the state court identifies the correct governing legal principle

25    from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

26    prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

1  simply because that court concludes in its independent judgment that the relevant state-court

2  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

3  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

4  (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its

5  independent review of the legal question, is left with a 'firm conviction' that the state court was

6  'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas

7  relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

8  decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

9         The court looks to the last reasoned state court decision as the basis for the state

10 court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned

11 decision, "and the state court has denied relief, it may be presumed that the state court

12 adjudicated the claim on the merits in the absence of any indication or state-law procedural

13 principles to the contrary." Harrington, 131 S. Ct. at 784-85 (2011).  That presumption may be

14 overcome by a showing that "there is reason to think some other explanation for the state court's

15 decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

16        Where the state court reaches a decision on the merits but provides no reasoning

17 to support its conclusion, the federal court conducts an independent review of the record.

18 "Independent review of the record is not de novo review of the constitutional issue, but rather,

19 the only method by which we can determine whether a silent state court decision is objectively

20 unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

21 decision is available, the habeas petitioner has the burden of "showing there was no reasonable

22 basis for the state court to deny relief. Harrington, 131 S. Ct. at 784. "[A] habeas court must

23 determine what arguments or theories supported or, . . . could have supported, the state court's

24 decision; and then it must ask whether it is possible fairminded jurists could disagree that those

25 arguments or theories are inconsistent with the holding in a prior decision of this Court. Id. at

26 786.

III.  Factual Background

Petitioner's opening brief on appeal contains a factual summary.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it below.

A.  Prosecution's Case

24-year-old Jessica Ward lives in the Sacramento area.  Ward met appellant through a mutual friend who lived in the same apartment complex as she.  Appellant and Ward became lovers and moved into an apartment at 1769 Capitol Park Drive in Natomas; the two lived together for a year, with Ward paying for everything.  Others, such as Ward's 4-1/2 year old daughter Layla and appellant's children, would stay with them from time to time.  Ward loved appellant and developed feelings for his family as well.  Ward's daughter was living with her parents in Citrus Heights.  (2 RT 368-374.)

Ward worked as an "escort" and had done so since turning 21.  This work includes prostitution.  Appellant knew of her line of work, but they did not talk about it.  Ward and appellant argued because appellant was having sex with other women.  Appellant punched and choked Ward during some of their arguments.  This occurred more than twice, and was a factor in their eventual breakup, which occurred around April 1, 2005.  Ward left the Capitol Park Drive apartments and went to her cousin's place since she "couldn't take it anymore."  Appellant phoned Ward "a lot" in the two-week period before April 20, 2005.  (2 RT 374-380.)  Appellant was not handling the breakup well.  His messages were angry and threatening, and he wanted Ward to return to the apartment so that the two could talk.  Ward would respond by asking, "Where's your girlfriend?"  After awhile, however, Ward began to miss appellant.

On April 20, 2005, appellant called Ward a number of times.  She agreed to return to their apartment, hoping things would be different.  Ward arrived in the later part of the evening, around 11 p.m., borrowing her friend's car to get there.  She parked around the corner and walked to the front door.  Their apartment was a downstairs unit with two bedrooms.  The front door opens into a living room, and the master bedroom is straight to the rear of the apartment.  Appellant answered her knock on the door and smiled at Ward.  She smiled back at him, glad to see him at that point.  Appellant said, "Let's go talk," and the two went to the master bedroom.  (2 RT 382-384.)  A relative and a friend of appellant's were seated in the living room, playing loud music on the computer.  Ward did not speak to the two men, but knew them as "Nino" and "Twin."  As the name implied, "Twin" has a twin

4

brother, but since Ms. Ward did not know him well, she did not know which twin he was.  After appellant and Ward were in the bedroom, appellant closed the door.  (2 RT 385-386.)

Ward sat on the bed.  Appellant told her that he wanted the two of them to go to Reno and get married.  Ward responded that she did not think this was a good idea because it wouldn't solve any of their problems.  Appellant asked her again, and again Ward refused.  After confirming that she was not going to go to Reno with him, appellant began punching Ward in the face with his fist as hard as he could.  She was hit three or four times before finding herself on her back on the floor.  Appellant pinned Ward down and continued to hit her.  She was crying and trying to block his punches with her arms.  Appellant hit Ward more than ten times and she kept trying to get away from him.  Ward was 5 feet 3/12 inches tall and weighed 120 pounds.  Appellant also kicked and stomped Ward on her side, head and shoulders while she was on the floor.  Ward begged appellant to stop.  Appellant would stop for a little while and resume the beating.  After the two had been in the bedroom for an hour, appellant took out a gun.  (2 RT 387-390.)

Ward described the gun as a .45 magnum revolver, chrome with a wooden handle.  Appellant pointed it at Ward, then put it in his mouth and told her, "I should just do it."  The gun had been under the mattress.  By this time, Ward had taken her clothes off and appellant tossed them out the door.  She disrobed because appellant told her to do so, and Ward was scared.  Appellant had Ward's belt, one that had studs on it.  He told her to lie on the bed and open her legs.  Ward feared that appellant would hit her with the belt, but he did not do so, hitting the bed next to her several times instead.  While doing so, appellant exclaimed repeatedly, "Oh, you want to fuck dudes."  Ward was pleading with appellant to stop.  She attempted to go to the bedroom window and open the blinds to see if she could get someone's attention.  Appellant grabbed her, threw her out on the bed and choked her to the point where she passed out.  (2 RT 391-397.)

During the course of the evening, appellant choked Ward about five or six times to the point of her passing out.  Appellant also threatened to pistol-whip Ward, telling her, "Maybe I should just beat the shit out of you with this gun," but did not do so.  (2 RT 396-402.)

Appellant allowed Ward to use the bathroom during this ordeal. He gave her a shirt to wear and accompanied her to the bathroom, which was across from the living room.  The two men Ward had seen when she first arrived that night were still there.  She did not ask them for help because she felt it would do no good.  Appellant told the two men, "Turn the music up.  I'm going to beat this bitch's ass."  After that, the music increased in volume.  (2 RT

404-408.)

Appellant and Ward had sex about five or six hours after the beatings started. She was attempting to get appellant to take her to the hospital, and was telling him that they could be together, that she loved him, and please not to beat her anymore. Ward knew that sex might calm appellant down, so she initiated sex with appellant while the two were watching television. She also complained that something was really wrong with her and that she was on the verge of losing consciousness. Finally, around 4 a.m. appellant had to take his mother to work, so he first drove Ward to the Sutter Emergency room at 28th and L in downtown Sacramento. Appellant took Ms. Ward's car keys and told her to call him when she was released. (2 RT 409-415, 3 RT 611-614.)

At the hospital, Ward was given a series of tests, including x-rays and a CAT scan to see if anything was broken. The staff asked her how she'd gotten hurt, and Ward told them she did not want to discuss it, just that her boyfriend had beaten her up. Ward did not give hospital staff appellant's name. Police Officer Cunningham interviewed Ward, but she did not give him any information about appellant since she did not want appellant to get in trouble. However, Ward was afraid that she or her family would be hurt if she told the police appellant's name. Appellant had met Ward's parents before, and knew where they lived. This worried Ward. (2 RT 416-420, 3 RT 822-828, 836-837.) [Footnote 3]

> [Footnote 3: At this point in her testimony, Ward was shown a series of photos (Exhibits 1-26, 2 CT 588-3 CT 613) that depicted her on the day that she reported the crime to the police. She described the contents of those photos to the jury. (2 RT 422-420.)]

Kerilee Wenker, M.D. was the emergency room physician who examined Ward at Sutter General Hospital at 4 a.m. on April 21, 2005. Dr. Wenker observed that Ward had very obvious bruising on her face and severe black eyes. Ward exhibited petikia, pinpoint areas of bleeding on the neck on both sides in a hand pattern, and petikia around her eyes and her mouth. Ward had multiple contusions on her shoulder, arm, her lower posterior rib cage, her anterior rib cage and a lot of bruising on her back. Her face and eyes were swollen. Ward had a small laceration on the inside of her upper lip. The petikia on the neck was consistent with strangulation, which is potentially lethal. There would be brain damage if the carotid artery were compressed for several minutes. (3 RT 727-737.)

Dr. Wenker ordered chest x-rays, a CAT scan, blood work, and a urinalysis. These revealed that Ward had a fracture of her nasal wall but no other abnormalities requiring treatment. Ward told the

doctor that she'd been assaulted by an ex-boyfriend, but refused to give details, saying, "We couldn't protect her." Dr. Wenker called the police. Ward appeared frightened and refused to give information to the police or to hospital staff. Ward was given a prescription for Vicodin and was administered painkillers, including morphine and Toridal, while in the emergency room. Ward told Dr. Wenker that she'd been strangled until she passed out for a few seconds, punched, kicked and thrown to the ground. (3 RT 738-743.) No surgery or follow-up was required for the nasal fracture. (3 RT 789.) Wenker spent 15 minutes with Ward that night, telling her that the next time it happened, she might be dead, so she really should follow up. (3 RT 781-785.)

When released from the hospital that same morning, Ward had a friend pick her up. He was told to bring a pistol since Ward was going back to the apartment to retrieve they keys to the car she'd driven to her and appellant's apartment the night before. The friend brought a "nine"; Ward and her friend parked around the corner from the apartment. Ward told him to give her two minutes inside and if she did not come out, to kick in the door. Ward looked through the master bedroom window and saw that appellant was asleep. Ward got into the apartment through the other bedroom window after removing a screen. She went to the master bedroom and was able to retrieve her friend's car keys from the pocket of appellant's pants and dash out of the apartment without being stopped. She and the friend, who she refused to name, picked up her friend's car and left the area. Ward stayed with a cousin and in hotel rooms for the next several days. (2 RT 431-434, 3 RT 615-638, see also 2 CT 823-824 (Def. Exhs. U, V.).)

Starting on April 21, 2005, appellant called Ward numerous times. He was upset over her taking her friend's car keys when he was asleep, telling Ward that he was going to "kick in my mom's door and shoot my dad in the face and kill my whole family." During other phone conversations that occurred, both appellant and Ward issued threats. Ward threatened to have the associates of her child's father, who was doing life in prison, deal with appellant. The threat to kill her family upset Ward; she felt it would be irresponsible of her not to warn them of appellant's threats. Ward so informed her father of appellant's threats and that he'd beaten her up. Her father insisted that she go to the police. (2 RT 434-438, 3 RT 694-696.)

Ward went to the police station in Del Paso Heights on April 22, 2005, a Friday, and was interviewed by Officer Janet Howell. A social worker and Howell's training officer, Hight, were present as well. Ward gave a statement concerning the events of April 20 and 21, 2005. (3 RT 839-846, 4 RT 913-914.) During this interview, Ward told Howell she went to the Capital Park Drive apartment the night of April 20 to retrieve her belongings, which was untrue. Ward lied because she felt foolish about going to the apartment for

the reason that appellant had invited her over and she missed him; at that point, Ward felt she should have known better. Ward corrected her statement in a later interview with the prosecutor and her investigator. Other parts of the statement generated on Ward's visit to the police on April 22, 2005 were out of chronological order, but Ward testified on direct examination that the facts contained therein were true except for the reason she went to the apartment in the first place. (2 RT 439-443, 3 RT 845-846.) [Footnote 4]

> [Footnote 4: On cross-examination, however, Ward admitted that her initial statement to Officer Howell contained several other untruths, such as that she stayed with her parents after moving out of the Capitol Park apartments prior to April 20, 2005 (2 RT 516-518, 3 RT 845-846), that she drove around looking for appellant's car on April 20 before entering the apartment on that date, that she used a key to enter the apartment (2 RT 526-531, 3 RT 846), and that she did not know "Nino," one of the two men in the living room during the beatings (2 RT 543-544, 3 RT 847.)

During the interview with Officer Howell, Ward stated that appellant had told her he and his friends sat outside her parent's house to see when Ward's father got home from work. At 4:56 p.m., while the interview was proceedings, Ward's cell phone rang. Ward informed Hight that it was appellant who was calling. Hight instructed Ward to answer the phone and hold the phone in such a way that both Ward and Hight could hear appellant. Appellant was yelling and agitated. Hight heard appellant say "the game's over. I'm going to kick your mom's door in and make it look like a home invasion. I'm ready, nigga. Let me load this right now. Hold on. Bring it, nigga. Bitch, nigga...[¶] I'm going to get all the people you feel about. I guarantee I'm gonna get ya. I'm not gonna get ya. I'm going to beat ya." This call lasted four to five minutes. During this call Mrs. Ward was egging appellant on, attempting to get him to say what he was saying. She was telling appellant, "Go ahead, try. My homies will take care of you." Ward hung up on appellant and appellant called back, telling Ward that he was going to make her eat her words and wasn't fooling around. Hight also wanted Ms. Ward to have her body examined for rape at the hospital, but she refused. (2 RT 443-447, 462-464, 3 RT 861-863, 4 RT 1120-1124.)

Hight went to the Capital Park Drive address in an attempt to find appellant, but no one was home when he arrived. (4 RT 1126-1127.) When Hight spoke with a neighbor, the neighbor did not mention hearing anything on the night of April 20, 2005. (4 RT 1145.)

1
2
3
4
5
6

Sacramento Police Officer Douglas Rosin arrested appellant on April 25, 2005. Rosin was informed that appellant was seen leaving an apartment complex on Mill Creek in North Sacramento. Officer Rosin, in uniform, was at a nearby intersection in a marked patrol car with a bar when appellant's vehicle drove by. Rosin attempted to pull appellant over, through use of his siren and a light bar, but appellant failed to stop immediately, going onto the freeway to the next exit before pulling over. Appellant was taken into custody, and Tadius Mathis was a passenger in the vehicle. (3 RT 790-796.) Appellant and his vehicle were searched and no weapons or drugs were found in the vehicle. (3 RT 800-801.)

7
8
9
10

Sacramento Police Officer James Luevano transported appellant to county jail following appellant's arrest. A rape kit was conducted on appellant, which includes a blood draw and a collection of hair samples in the pubic area. Luevano also read appellant his Miranda rights, and appellant understood and indicated that he would speak with the officer.

11
12
13
14

Appellant told Luevano when asked what happened on April 20, 2005 with respect to Jessica Ward that he did not know what the officer was talking about and did not know anyone by that name. (3 RT 803-808.) Appellant also told the officer that he did not want to discuss the matter with him, and appeared not to want to speak to the officer after being told who made the accusations leading to his arrest. (3 RT 819.)

15
16
17
18
19

Within a couple of days following her interview with the police on April 22, 2005, an investigator called Ward and told her that appellant had been arrested. Appellant and Ward communicated with each other via the phone in appellant's holding cell. These calls would be in the middle of the night, around 3 a.m. Ward identified a tape recording of some of those calls (People's Exhibit 38A), which was played to the jury. After listening to the tape, Ward stated that she wished none of this had happened, including her testifying against appellant and his being in jail. (2 RT 448-454.)

20
21
22

Some of the phone calls made were through appellant's mother as a three-way call. Throughout this time period, Ward was still dealing with the love she had for appellant. Ward initiated a protective order that appellant not be allowed to contact her, but did not follow up on it. (2 RT 456-458.)

23
24
25
26

The conversations between Ward and appellant vacillated between appellant's being angry with Ward and his professing love for her. At this point, tapes of two phone conversations between appellant and Ward, one right after his arrest and the other in the early morning hours of April 26, 2005, were played to the jury. (People's Exhibits No. 39A, 40A.) Ward wrote appellant one letter while he was in custody, in which she expressed her feelings about

his cheating on her and that she loved him.  (2 RT 459-468.)

On June 3, 2005, Ward gave a statement to the defense attorney and his investigator, telling them she wanted to "straighten things out."  Ward testified that she lied during this interview, claiming that she was beaten by a john before going to her apartment on April 20, 2005 and falsely blaming the beating on appellant due to the fact that she found him with another woman, an Eastern Indian lady.  (3 RT 643-650.)  The Eastern Indian woman that appellant was seeing was a subject of the letters he wrote to appellant while he was in custody  (Defense Exhs. W1, X1, Y1) and the card she sent along with a receipt (Z1) pictures (AA).  Ward read the text messages from this woman on appellant's phone.  This upset Ward to the point where she was crying herself to sleep.  (3 RT 651-655.)  A tape was played that was taken in December of 2005, during which Ward expressed her displeasure concerning appellant's relationship with the Indian woman.  (3 RT 656-657, 3 CT 849-854 (Defense Exh. CC).)

In August of 2005, Ward was asked to come to the district attorney's office to meet with the prosecutor and her investigator, John Trefethan.  Ward did not want to do so, but eventually agreed, arriving with her father, Jan Lindman.  Ward cleared up a couple of the differences between statements contained in the initial interview with the police and what she remembered of the night of April 20-21.  In her several appearances before trial, it was arranged for Ward to take a cab to the district attorney's office and wait there until she was told whether she had to appear; Ward felt this arrangement was safer than having to appear outside of court.  (2 RT 469-472, 4 RT 931-934.)  Trefethen felt that the person Ward identified as "Twin," one of the men in the living room of the apartment when the beating occurred, was Jamal Broadbent, since he remembered that name from a prior encounter.  Trefethen showed Ward photos of Jamal Broadbent and his twin brother, Jason Broadbent, but Ward was uncertain as to which of the two was present in the apartment.  (4 RT 939-942.)  Ward did identify Tideris Mathis or Nino as the second person in the living room, although she was quite reluctant to do so.  (4 RT 945-946.)  Ward also refused to give the name of the friend who helped her retrieve the car keys after she was discharged from the hospital.  Ward was afraid of getting other people involved in the incident, because of her fear that they would be retaliated against.  (4 RT 948-949.)

Ward visited appellant four or five times in December of 2005, while appellant was in jail.  Ward showed up for her court appearanace on December 15, 2005.  She was at one point subpoenaed to court, but did not show up at the time specified.  Ward showed up in court a few days later, and was ordered to appear in court January 23, 2006, but did not appear on that date.  She tried to leave the state, but failed to do so, and was arrested in Fremont on January 30, 2006 for failure to appear.  Ward had

posted ads on the Internet through a website, myredbook.com, for
her escort service.  A vice detective with the Sacramento Police
found her through those ads and posed as a potential customer so
that the detective and Trefethen could arrest her.  Following her
arrest in a Fremont motel room, Ward and her possessions at the
time were transported back to Sacramento.  On the way back to
Sacramento, Ward had a conversation with Trefethen.  He
mentioned the amount of the bail that was set for her, and she
indicated that she could make that amount.  On hearing this
Trefethen personally requested that the bail be increased to
$250,000 so that Ward couldn't make bail....[1]

****

Ward had not been to jail before, and was horrified.  She spent
eight days in jail.  When Ward attempted to bail out, the district
attorney requested a determination that the funds used were not
obtained illegally. [Footnote 5] (2 RT 472-478, 509.)

> [Footnote 5: The record refers to a "1275 hold."
> The pertinent Penal Code provision is section
> 1275.1.  (2 RT 508.)]

Finally, an agreement was reached whereby Ward would be
released on her own recognizance.  She agreed to have Trefethen
pick her up.  During trial, Trefethen took Ward to and from court,
staying close to her when she went into the hallway.  Ward's room
and board is being paid for by the district attorney's office.
Trefethen applied for witness protection funds and was given the
$8750 maximum for a six-month period.  He doles that money out
to her at the rate of $200 per week.  However, Ward is unaware of
the total amount of money made available to her and does not
know the ultimate source of funding.  She also has full use
immunity from prosecution for anything she testifies to on the
stand, including her carrying a firearm, her use of drugs, and her
work as a prostitute.  However, Ward was not promised that she
would not be prosecuted for her solicitation activity leading to her
arrest on the warrant for failure to appear.  She denied that
receiving such money and assistance affects the truthfulness of her
testimony. (2 RT 472-478, 479-491, 498-505, 4 RT 960-965.)

---

[1]  In his opening brief, petitioner also stated that "Ward was kept in jail, denied a bail she
could make, and was denied showers because she would not testify and the district attorney's
office would not drop the charges.  (2 RT 496-498, 4 RT 950-965.)" (Petitioner's opening brief,
filed June 17, 2010, at 15.)  Ward testified that while she was in jail she was denied showers, bail
and phone calls because she would not come to court and testify.  (RT at 497.)  After a lawyer
was appointed to represent her, the issues of showers and phone calls were brought up in court
and she was released from jail within a few days.  (RT at 499.)  In her testimony, Ward did not
elaborate as to how she knew she was being denied showers and phone calls based on her refusal
to come to court.

When Ward was arrested, she had Vicodin and marijuana on her person, but she was not told one way or the other whether she would be prosecuted for those crimes. (3 RT 702-704.) [Footnote 6.] Both the district attorney and her investigator told Ward that if she changed her

> [Footnote 6: Trefethen denied searching Ward's belongings and finding Vicodin pills or marijuana, stating that she would be lying if that were what she testified to. (4 RT 1083-1084.)]

story on the stand she would go to jail herself, and that the charges were not going to be dropped. (2 RT 493-495.) However, the rape charge first brought against appellant for the sex he had with Ward on the night of the beating was dismissed. (3 RT 708.)

Ward loves appellant and does not want to see him go to jail for a long time. (3 RT 707-714.)

B. Defense Case

Sacramento Police Sergeant Michael Carrasco and Officer Chris Baptista participated in the apprehension of appellant on April 25, 2005. Appellant's vehicle was searched, and appellant's residence keys were obtained. Sergeant Carrasco and Officer Baptista searched appellant's residence with Officer Joy. During these searches, the officers found no weapons or ammunition consistent with the weapon allegedly used in this case. Nor did they find a pink vinyl belt with studs or any contraband. The officers did not collect any bedding, clothing, request any photos of the residence, nor did they request crime scene investigation to look for blood spatters or gunshot residue. A cell phone belonging to appellant was recovered, however, (4 RT 1147-1153, 1157-1162.)

Brian Jensen, a vice detective with the Sacramento Police Department at that time, was contacted January 30, 2006 by Investigator Trefethen to assist in arresting Jessica Ward for failure to appear in court. He informed Jensen that Ward was advertising escort services through sanfranciscoredbook.com using the screen name of Sexy Erica. On reviewing her advertisement, which stated that Sexy Erica was from Sacramento but working in Fremont and gave a phone number, Trefethen and Jensen drove to Fremont, arriving there at 8 p.m. After making contact with a local police officer, Jensen called Sexy Erica's phone number and asked if she were available for an appointment that evening. Jensen was looking for an "unrushed hour" and was quoted a price of $200. He asked if that included a "GFE" or girlfriend experience and was told that he would be charged extra for that. Jensen said he was fine with the unrushed hour, and Ward told Jensen she was staying at the Good Night Inn in Fremont. He, Trefethen and the local officer went to the Good Night Inn, and Jensen phoned again to get

1   the room number.  They went to the room Ward stated she was
2   staying in, and entered.  Ward was very upset that she was being
    arrested; Trefethen placed her in handcuffs.  Ward was searched
3   before being placed in the back of a police car, but Jensen did not
    find any contraband or narcotics. He did find a prescription bottle
4   with one blue Vicodin pill.  No marijuana was found, but there was
    an odor of burnt marijuana in the hotel room.  Aside from verifying
5   that the blue pill was Vicodin, Jensen had no conversation with
    Ward about it.  (4 RT 1177-1194.)

6   Defense investigator Michelle Miller went to 1769 Capital Park
    Drive, Apt. No. 261, and took photographs of the exterior and
7   interior of the residence on December 9, 2005.  The tenants were
    new, and allowed her to do so.  The photos were of the walkway
8   and front door, with a bedroom window on the left.  (Defense Exh.
    L); the front door and window to bedroom number one (Defense
9   Exh. M); the interior of bedroom number one – the bedroom in
    which the assault did not occur (Defense Exh. N, P); an outside
10  view of a living room window (Defense Exh. Q); interior views of
    the living room including the living room window and the door
11  leading to the outside patio (Defense Exhs. R, S, T); different
    views of the apartment patio (Defense Exhs. U, A, B, C, D); the
12  patio window leading to bedroom number two, where the assault
    occurred, from the patio and from the bedroom (Defense Exhs. E,
13  F.G); the interior of bedroom number two, including the interior of
    the bedroom closet (Defense Exhs. H, I); the kitchen window from
14  both the outside and inside (Defense Exhs. J, K); and the patio
    (Defense Exh. EE).  (5 RT 1214-1226.)  Investigator Miller also
15  took measurements of apartment 261.  The patio wall and post
    were over 60 inches high and the patio itself is seven feet in width.
16  (5 RT 1226-1227.)

17  On June 3, 2005, Miller and defense counsel interviewed Jessica
    Ward.  Ward stated that she works as a prostitute, working out of
18  Comfort Inn, Motel Six and the Goodnight Inn.  Ward always uses
    false names, and had false identifications so that she could rent the
19  rooms.  As for the events of April 20-21, 2005, Ward told defense
    counsel that she turned a trick and the customer beat her up.  The
20  customer did not give her his name.  Ward visited appellant's
    residence after she'd been beaten up.  Ward drove herself to the
21  hospital.  Ward was emphatically told to tell the truth during this
    interview.  (5 RT 1228-1230.)
22
    Miller talked with Ward again on January 25, 2006 about whether
23  she'd been told that other women were visiting appellant while he
    was in custody.  According to Ward, her father was giving her that
24  information, and her father had been working closely with the
    district attorney.  Ward did not know whether the district attorney
25  or her investigator was giving her father tha[t] information, but it
    was coming from one or the other.  (5 RT 1231-1232.)  Ward was
26  as of February 22, 2005 still advertising her services on the

1    Internet.  (5 RT 1233.)

2    It was stipulated that from March 9, 2005 through May 7, 2005,
     Jamal Broadbent, also known as Twin, was in continuous custody
3    at the Sacramento County Jail.  (5 RT 1246.)

4    (Appellant's Opening Brief, filed June 17, 2010, at 4-19.)

5    IV.  Discussion

6         A.  Alleged Prosecutorial Misconduct

7         Alleged Coercion of Testimony

8         Petitioner first argues that the prosecutor committed misconduct by forcing the

9    victim to testify and commit perjury.  Petitioner raised this claim in state habeas proceedings.

10   The Sacramento County Superior Court was the last state court to issue a reasoned decision

11   addressing this claim.  (See orders denying state habeas petitions filed June 17, 2010.)

12   Accordingly, the undersigned considers whether the denial of this claim by the Superior Court

13   was an unreasonable application of clearly established Supreme Court authority.

14        The Sacramento County Superior Court denied this claim of prosecutorial

15   misconduct for the following reasons:

16        Petitioner first claims prosecutorial misconduct in "forcing" an
          "unreliable and incredible" witness/victim "to participate in the
17        trial," and that trial and appellate counsel were ineffective in
          failing to raise this at the trial court level and on appeal.
18        Specifically, petitioner claims that the prosecutor used knowingly
          false and perjured testimony from the victim, that the victim lacked
19        all credibility, repeatedly lied, and had absconded from a subpoena,
          then was placed in jail with bail beyond her reach and was denied a
20        shower and phone calls, which resulted in terrorizing the victim.
          He claims that she received full use immunity for her tainted
21        testimony, but not for her failure to appear, and that she was
          released on her own recognizance to the investigator's custody,
22        given money, and was not prosecuted for her failure to appear.

23        Petitioner, however, fails to attach any reasonably available
          documentary evidence to support his claim, either that the victim
24        lied on the witness stand or was coerced into testifying (see In re
          Swain (1949) 34 Cal.2d 300; In re Harris (1993) 5 Cal.4th 813, 827
25        fn. 5).

26        The court's underlying file does indicate that when the victim

                                    14

1    failed to appear, a warrant was issued on January 23, 2006 for her
2    arrest with a specified $100,000 for her to post as bail.  It also
     indicates that on February 6, 2006, she appeared in court, and then
3    was released on her own recognizance with agreement to appear
     the next day in court; the next day, she appeared and was ordered
4    to appear again the next day.  It also indicates that the prosecutor
     granted her use immunity for her testimony about her work as a
5    prostitute, and a few days later was granted a broader use immunity
     regarding any act that might incriminate her.  She appeared the
6    next day, and was ordered to appear the next day again.  This
     scenario was repeated again until she testified, on February 14, 15
7    and 16, 2006.  However, none of this establishes that the victim
     lied on the witness stand or was coerced into testifying so as to
8    render her testimony unreliable.

9    And, other evidence at trial strongly corroborated her testimony,
     including evidence of her physical condition at the hospital the
10   next day, and the telephone call that petitioner made to her that was
     overheard by an officer, in which petitioner made threats to her
11   family.

12   Petitioner simply fails to establish a prima facie case for relief,
     requiring the denial of the claim (In re Bower (1985) 38 Cal.3d
13   865.)

14   (Superior Court order denying habeas petition, filed June 17, 2010.)

15         If the prosecution knowingly presented false testimony, then petitioner is entitled

16   to habeas relief "if there is any reasonable likelihood that the false testimony could have affected

17   the judgment of the jury."  United States v. Agurs, 427 U.S. 97, 103 (1976).  Similarly,

18   petitioner is entitled to habeas relief if the admission of coerced or involuntary testimony renders

19   a trial so fundamentally unfair as to violate due process.  Williams v. Woodford, 384 F.3d 567,

20   593 (9th Cir. 2004).

21         After reviewing the record, the undersigned agrees with the Superior Court that

22   petitioner's claim that the prosecutor coerced the victim to testify falsely is not supported by the

23   record, and petitioner has presented no evidence to support this claim.  To warrant federal habeas

24   relief, "the petition is expected to state facts that point to a real possibility of constitutional

25   error."  O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990).  Mere conclusions that federal

26   rights have been violated, without specifics, do not state a federal claim.  James v. Borg, 24 F.3d

                                          15

20, 26 (9th Cir. 1994.)

The victim's testimony was corroborated by her physical condition at the hospital, as well as her statements at the hospital that her boyfriend caused her injuries, and petitioner's telephone call to her threatening her and her family. Petitioner's unsupported claim that the prosecutor coerced the victim to commit perjury is not supported by the record.

The denial of this claim by the Superior Court was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim is denied.

*Closing Argument*

Petitioner argues that the prosecutor committed misconduct during closing argument by telling the jury that other juries had found a broken nose to be great bodily injury. The California Court of Appeal was the last state court to issue a reasoned decision addressing this claim. Accordingly, the undersigned considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends the prosecutor committed prejudicial misconduct during her closing summation by telling the jury that other juries had found a broken nose in and of itself to be great bodily injury and that such findings have been upheld on appeal. Thus, according to defendant, the great bodily injury finding on count five must be reversed.
>
> The Attorney General concedes that the prosecutor should not have referred to a jury's verdict in a different case, since that verdict was outside the record of the present case. We accept the Attorney General's concession.
>
> The remaining question is whether the misconduct was prejudicial. The Attorney General claims there is no reasonable probability that the remark influenced the jury to defendant's detriment. We agree.
>
> The emergency room physician testified on cross-examination that a CAT scan of J.W.'s nose revealed a "[s]lightly separated fracture of the posterior lateral right nose base." The physician rejected defense counsel's suggestion that the "discontinuity," or "irregularity on the surface of a bone" revealed by the CAT scan,

16

was "not necessarily a fracture."

In his summation, defense counsel argued that the physician "would like [the jury] to believe that, Oh, this was-this fracture was just awful. I think what's more key is what the radiologist called it" in a report to the physician. The report called it "a subtle fracture, subtle, not significant, not substantial, subtle. [¶] More synonymous with minor. That's what the radiologist called this, okay? That's what he called it. So, how do you argue-how do they come in here and say that, ladies and gentlemen, that's great bodily injury? Is that really the same as a compound fracture?"

In her closing summation, the prosecutor addressed defense counsel's argument as follows:

"[THE PROSECUTOR]: And when you look at medical words like 'subtle' in describing some form of fracture, it's important to be able to ask a medical doctor, does that word have some medical meaning? [¶] Well, [defense counsel] had all of the opportunity on direct and cross-examination to ask that question. What does this word mean to you, [the emergency room physician], when you're evaluating somebody's radiological findings, because she described to you the nature of that fracture that was in the-inside the face, deep in there, and the type of force that would cause that. [¶] And again, great bodily injury is not an item by item isolated, well, this one's not, that one's not, that one's not. You agree on the injuries and you look at them all together, that's how you made that decision. That's how you make the decision. And the instruction doesn't talk about comparing minor or moderate injuries to significant and substantial injuries. That's not the way the instruction reads at all. [¶] In fact, the instruction says, great bodily injury is not minor to moderate harm. It is significant or substantial injuries. *And case law in California has upheld a broken nose by itself as being-*

"[DEFENSE COUNSEL]: Objection, your Honor, in that it's a broken nose, not a fracture. And it's not a question for the jury to decide. It's a question of law and not of fact.

[During argument on the motion for new trial, defense counsel argued that the court reporter mistranscribed his objection. He had objected that the question of great bodily injury was "a factual issue for the jury, not an issue of law." The trial court agreed with defense counsel's assertion.]

"THE COURT: Overruled.

"[THE PROSECUTOR]: *Juries have found in the past that a broken nose, by itself, with no other injuries, was great bodily injury. And that's been upheld by our courts.* So it is your decision. It is your decision. And that's why you look at all these things

17

together and you will come to that same conclusion, that her injuries were significant." (Italics added.)

Following the verdict, defendant moved for a new trial on the ground of prosecutorial misconduct. (§ 1181, subd. 5.) The motion argued that the prosecutor, by stating what other juries had found to be great bodily injury and declaring that such finding had been upheld by the courts, had put before the jury matters that were not in evidence and to which defense counsel could not respond. The motion further argued that the prosecutor not only lessened, but entirely removed, her own burden of proof by claiming that other juries and appellate courts had resolved the issue whether a broken nose constituted great bodily injury. In argument, defense counsel suggested the trial court compounded the misconduct by overruling his objection.

The trial court denied the motion, noting the jurors had been instructed that counsels' remarks were not evidence; that they must follow the court's instructions on the law rather than the attorneys' comments; that great bodily injury is "defined as a significant or substantial physical injury ... greater than minor or moderate harm"; and that the People have the burden of proving the allegation beyond a reasonable doubt. Thus, the "factual issue was not removed from this jury"; the "instruction required the jury to determine from the facts of the case whether great bodily injury occurred beyond a reasonable doubt." The court noted that the trial lasted 30 days; J.W. testified for more than two days; the jury deliberated for 24 hours over six days; and it convicted on some counts, acquitted on another, and deadlocked on another. Thus, the court found the comment was not misconduct; it did not prevent defendant from having a fair trial; and absent the disputed comments, there is no reasonable probability of a more favorable result.

Both disputed remarks, i.e., that "[j]uries have found in the past that a broken nose, by itself, with no other injuries, was great bodily injury," and that such findings have "been upheld by our courts," asserted facts outside the present record. By explicitly referring to those facts, the prosecutor committed misconduct. (People v. Frye (1998) 18 Cal.4th 894, 976; People v. Bain (1971) 5 Cal.3d 839, 848.) Defendant's timely objection to the remarks should have been sustained.

Although the prosecutor's comment was improper, it could not have prejudiced defendant. "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'"

(People v. Brown (2003) 31 Cal.4th 518, 553-554, quoting People v. Frye, supra, 18 Cal.4th at p. 970.) Put differently, the defendant must show a "reasonable probability the jury was influenced by the prosecutor's reference to undisclosed evidence to defendant's detriment." (Frye, supra, at p. 976; see People v. Medina (1995) 11 Cal.4th 694, 758.)

In this case, it is unlikely that the disputed statements influenced the jury to defendant's detriment. In her opening summation, the prosecutor properly based her argument regarding great bodily injury upon the evidence adduced at trial. She highlighted the physician's testimony that J.W. suffered severe black eyes and a strangulation injury that was potentially lethal. She noted that burst blood vessels in her face, caused by defendant strangling her, could be considered great bodily injury regardless of other injuries. But the prosecutor nevertheless cautioned, "We're gonna look at all of it." She emphasized J.W.'s contusions and bruising, the swelling to her face and eyes, the laceration on the inside of her mouth, the nose fracture that went deep into her facial structure, and the fact she had to be given morphine for her pain. The prosecutor argued, "That by itself, I submit, you're breaking bones in a woman's face, that is great bodily injury."

The prosecutor's statement in closing summation that other juries had found a broken nose to constitute great bodily injury followed directly from the argument she had already made. Immediately following the disputed remark she emphasized, "So it is your decision. It is your decision. And that's why you look at all these things together and you will come to that same conclusion, that her injuries were significant."

These last comments effectively told the jury *not* to focus on the nasal fracture alone, and *not* to rely on what other juries had done in lieu of making its own decision. It is not reasonably probable that the jury found the disputed remark more influential than these subsequent remarks. Thus, there is no "reasonable probability the jury was influenced by the prosecutor's reference to undisclosed evidence to defendant's detriment." (People v. Frye, supra, 18 Cal.4th at p. 976.)

Further, because the prosecutor urged the jury to make its own decision, it is not reasonably probable that the disputed remark diminished the jury's sense of responsibility for the verdict. Nor is it reasonably probable that the jury understood the remarks about what other juries had done as somehow relieving the prosecution from its obligation to prove its case beyond a reasonable doubt. (E.g., People v. Marshall (1996) 13 Cal.4th 799, 831.)

Finally, given the abundant evidence of great bodily injury apart from the nose fracture, including the burst blood vessels in J.W.'s face, there is no reasonable probability of a more favorable result

1  absent the improper argument. (<u>People v. Navarette</u> (2003) 30
   Cal.4th 458, 512.)

2

3  Defendant also claims the prosecutor's statement violated his Sixth
   Amendment confrontation, cross-examination and impartial jury
   rights, thus requiring the prosecution to prove the error harmless

4  beyond a reasonable doubt. He has forfeited his Sixth Amendment
   claims by failing to assert them in the trial court. (<u>People v. Waidla</u>

5  (2000) 22 Cal.4th 690, 726, fn. 8; <u>People v. Alvarez</u> (1996) 14
   Cal.4th 155, 186.) In any event, Sixth Amendment confrontation

6  and cross-examination rights apply to adverse *evidence*. There is
   no indication that the jury ignored its admonition that "Nothing

7  that the attorneys say is evidence." (CALCRIM Nos. 104, 222.)
   Nor is there any indication that the disputed comments adversely

8  affected the jury's impartiality.

9  (<u>People v. Brown</u>, 2007 WL 2687595, at *2-5 (Sept. 14, 2007).)

10         Respondent first argues that the instant claim of prosecutorial misconduct is

11  procedurally barred.  The California Court of Appeal did not reject this claim as procedurally

12  barred.  Rather, the state appellate court found that petitioner's related Confrontation Clause

13  claim was procedurally barred.  Accordingly, respondent's argument that the instant prosecutorial

14  misconduct claim is procedurally barred is without merit.

15         Prosecutorial misconduct rises to the level of constitutional deprivation only when

16  it "so [infects] the trial with unfairness as to make the resulting conviction a denial of due

17  process." <u>Darden v. Wainright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>,

18  416 U.S. 637, 643 (1984)).

19         The undersigned agrees with the state appellate court that while the prosecutor's

20  at-issue comments were improper, they did not infect the trial with unfairness so as to make

21  petitioner's assault conviction a denial of due process.  As the California Court of Appeal noted,

22  it is unlikely that the prosecutor's disputed comments influenced the jury to petitioner's

23  detriment.  There was plenty of evidence that petitioner had caused the victim to suffer great

24  bodily injury, apart from and including the nose fracture.  In addition, immediately after the at-

25  issue remarks, the prosecutor reminded the jury that it was *their* decision.

26         The jury had also been instructed that nothing the attorneys said, including during

1  their closing arguments, constituted evidence.  (CT at 322.)  Based on that instruction, the jury

2  would have known that the at-issue comments did not constitute evidence.  Juries are presumed

3  to follow instructions.  Weeks v. Angelone, 528 U.S. 225, 234 (2000) (juries are presumed to

4  follow instructions).

5          For the reasons stated above, the undersigned finds that the prosecutor's improper

6  remarks did not result in a due process violation as to petitioner's conviction for assault.

7  Because the denial of this claim of prosecutorial misconduct by the California Court of Appeal

8  was not an unreasonable application of clearly established Supreme Court authority, this claim is

9  denied.

10         In the instant action petitioner also argues, as he did in state court, that the

11  prosecutor's statements (found improper above) violated the Confrontation Clause.  Respondent

12  argues that this claim is procedurally barred based on the state appellate court's finding that

13  petitioner waived this claim.

14         Federal courts may reach the merits of habeas petitions despite an asserted

15  procedural bar so long as they are clearly not meritorious.  Franklin v. Johnson, 290 F.3d 1223,

16  1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997).  Because the

17  instant claim is without merit, the undersigned will not reach the procedural bar issue.

18         The Confrontation Clause of the Sixth Amendment to the United States

19  Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to

20  be confronted with the witnesses against him."  The "witnesses" to which the Confrontation

21  Clause refers include not only the witnesses testifying in court, but also certain out-of-court

22  declarants.  Crawford v. Washington, 541 U.S. 36, 50-51 (2004).

23         As noted by the state appellate court, the prosecutor's at-issue comments were not

24  evidence, as the jury was instructed.  For that reason, these comments did not invoke the

25  Confrontation Clause of the Sixth Amendment.  Because the denial of this claim by the

26  California Court of Appeal was not an unreasonable application of clearly established Supreme

1    Court authority, this claim is denied.

2              B.  Alleged Insufficient Evidence

3              *Legal Standard*

4              When a challenge is brought alleging insufficient evidence, federal habeas corpus

5    relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

6    most favorable to the prosecution, no rational trier of fact could have found "the essential

7    elements of the crime" proven beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,

8    319 (1979).  Jackson established a two-step inquiry for considering a challenge to a conviction

9    based on sufficiency of the evidence.  U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en

10   banc).  First, the court considers the evidence at trial in the light most favorable to the

11   prosecution.  Id.,citing Jackson, 443 U.S. at 319.  "'[W]hen faced with a record of historical facts

12   that supports conflicting inferences," a reviewing court 'must presume—even if it does not

13   affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of

14   the prosecution, and must defer to that resolution.'"  Id., quoting Jackson, 443 U.S. at 326.

15             "Second, after viewing the evidence in the light most favorable to the prosecution,

16   a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

17   rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  Id.,

18   quoting Jackson, 443 U.S. at 319.  "At this second step, we must reverse the verdict if the

19   evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would

20   have to conclude that the evidence of guilt fails to establish every element of the crime beyond a

21   reasonable doubt."  Id.

22             Superimposed on these already stringent insufficiency standards is the AEDPA

23   requirement that even if a federal court were to initially find on its own that no reasonable jury

24   should have arrived at its conclusion, the federal court must also determine that the state

25   appellate court not have affirmed the verdict under the Jackson standard in the absence of an

26   unreasonable determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

1    *Alleged Insufficient Evidence re: victim's credibility and great bodily injury*

2          Petitioner first argues that there was insufficient evidence to support his

3    convictions because of the victim's lack of credibility.  Petitioner argues that the evidence

4    demonstrated that the victim was motivated to lie because she was jealous of his relationships

5    with other women.  Petitioner further argues that the victim's injuries are not consistent with a

6    finding of great bodily injury.

7          The Superior Court, the last state court to issue a reasoned decision addressing

8    these claims, denied these claims for the reasons stated herein:

9              Petitioner essentially asks this court to reweigh the evidence, but
              that is not the court's role on habeas corpus; rather, the court only
10             determines whether there was substantial evidence to support the
              judgment.  As the evidence overwhelmingly showed guilt,
11             petitioner fails to establish a prima facie case for relief requiring
              denial of the claim (Bower, supra).

12

13   (Superior Court order denying habeas petition, filed June 17, 2010.)

14         The jury obviously found the victim's testimony believable, rejecting the

15   defense's attempt to demonstrate that she was not telling the truth.  A reviewing court may not

16   second-guess decisions the jury made in the course of determining the credibility of witnesses,

17   resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences

18   from proven facts.  Jackson, 443 U.S. at 319; McDaniel v. Brown, 130 S.Ct. 665, 674 (2010)

19   (under Jackson, a court must review all the evidence in the light most favorable to the

20   prosecution and may not merely recite or highlight inconsistencies in the testimony).  For these

21   reasons, petitioner's insufficiency of the evidence claim challenging the jury's reasonable

22   decision to believe the victim's trial testimony is without merit.

23         Petitioner next argues that there was not sufficient evidence to support his

24   conviction for assault with great bodily injury.  As discussed above, in addition to a fracture of

25   her nasal wall, the victim had bruising on her face and severe black eyes, multiple contusions on

26   her shoulder, arm, her lower posterior rib cage, her anterior rib cage and a lot of bruising on her

1    back, swollen face and eyes, and a small laceration on the inside of her upper lip.  In addition, the

2    petikia on the victim's neck was consistent with strangulation, which is potentially lethal.

3            Based on this evidence, the jury's finding that petitioner had caused great bodily

4    injury was not unreasonable.  See People v. Salas, 77 Cal.App.3d 600, 758-59 (1978) (evidence

5    that the victim's nose was broken, one tooth was knocked out, sustained cuts on nose, cheek and

6    lip requiring four sutures was sufficient to support jury finding of great bodily injury); People v.

7    James, 133 Cal.App.2d 478 (1955) (evidence that victim had possible nose fracture, a black eye,

8    a few loose teeth and was bleeding from the face was sufficient evidence that victim had suffered

9    great bodily injury.)  Therefore, the denial of this claim by the Superior Court was not an

10   unreasonable application of clearly established Supreme Court authority.

11                         *Alleged Insufficient Evidence re: Criminal Threats*

12           On direct appeal petitioner raises several related claims, including insufficient

13   evidence, regarding his convictions for making criminal threats.  The California Court of Appeal,

14   the last state court to issue a reasoned decision addressing these claims, denied these claims for

15   the reasons stated herein:

16           Defendant contends counts six and seven must be reversed because
         (1) section 422 is ambiguous and must be construed to require that
17       threats made against members of a victim's family be conveyed to
         those family members, (2) there was insufficient evidence that he
18       intended that J.W.'s family members be informed of the threats he
         had voiced against them, and (3) no instruction required the jury to
19       evaluate this issue. We are not persuaded.

20           Counts six and seven alleged that "defendant did willfully and
         unlawfully threaten to commit a crime which would result in *death*
21       *and great bodily injury to [J.W.]*, with the specific intent that the
         statement be taken as a threat." Both counts further alleged that
22       "the said [J.W.] was reasonably in sustained fear of *his/her safety*
         *and the safety of his/her immediate family.*" (Italics added.)
23
             First, we observe that the jury was initially instructed that, in order
24       to prove that defendant was guilty of the crimes alleged in counts
         six and seven, the People had to prove the following elements:
25
             "Number One, that the defendant willfully threatened to unlawfully
26       kill or unlawfully cause great bodily injury *to [J.W.]*.

                                                    24

"Number two, the defendant made the threat to [J.W.] orally or by electronic communication device.

"Number three, the defendant intended that his statement be understood as a threat.

"Number four, the threat was so clear, immediate, unconditional and specific that it communicated to [J.W.] a serious intention and the immediate prospect that the threat would be carried out.

"Number five, the threat actually cause *her own safety or the safety of her immediate family* d [J.W.] to be in sustained fear for.

"And number six, [J.W.'s] fear was reasonable under the circumstances." (Italics added; see CALCRIM No. 1300.)

During deliberations, the jury requested clarification "relative to sections # 1 and # 5. Section # 5 includes 'Safety of her immediate family.' Section # 1 speaks only to a threat to [J.W.] Question: In section # 1, Does 'willfully threatened to unlawfully kill or unlawfully cause G.B.I.' apply to [J.W.'s] immediate family as well as [J.W.]."

The trial court answered the jury's question by reading the corresponding portion of the former pattern instruction, CALJIC No. 9.94, which provides as element one: "A person willfully threatened to commit a crime which, if committed, would result in death or great bodily injury to another person." The phrase, "death or great bodily injury to another person," is taken directly from section 422.

Following the verdict, the trial court explained that section 1 had been phrased as it was because CALCRIM No. 1300 "tells us to insert the name of the complaining witness, which we did." The court opined that this direction by the CALCRIM authors "was probably an error."

Counts six and seven of the second amended information alleged violations of section 422, which provides in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and *thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety,* shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the

25

state prison." (Italics added; see People v. Toledo (2001) 26 Cal.4th 221, 227-228.)

As the statutory language provides, a violation of section 422 is committed when there is a threat made to commit a crime that will result in death or great bodily injury to "another person." (§ 422 .) That "other person" may be the person to whom the threat is made or may be a member of that person's immediate family.

But, according to CALCRIM No. 1300, the first element that must be proved in order to convict of criminal threats is that "[t]he defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to [insert name of complaining witness]." The direction to insert the name of the complaining witness gave rise to the confusion here because the statute encompasses threats to kill or injure the complaining witness or the complaining witness's family members. The jury, by its question, noted this confusion.

The confusion was cured, however, when the trial court answered the jury's question relating to this confusion by using the language of CALJIC No. 9.94 and explaining to the jury that it need only be proved that defendant must have made a threat to cause the death of or great bodily injury to another person.

The court's answer to the question was, of course, potentially problematic because, according to the pleadings, J.W. was the person put in sustained fear, and she was the person slated for death or great bodily injury. But the evidence showed, and the jury perceptively noted, that although J.W. was put in sustained fear it was her family members who were slated for death or great bodily injury. Even given this variance, no party objected or complained that the variance between the pleadings on the one hand and the proof and instructions on the other, was material or prejudicial and, thus, any such contention is forfeited. (See People v. Hardy (1992) 2 Cal.4th 86, 150.) And ultimately, the jury received correct instructions on the law to be applied to the evidence that it heard and there was no instructional error.

Next, contrary to defendant's argument, the statute's use of both a broader phrase ("another person") and a narrower phrase ("person threatened") does not mean that the statute is ambiguous or " 'susceptible of two constructions.' " (People v. Hill (1995) 37 Cal.App.4th 220, 226, quoting People v. Overstreet (1986) 42 Cal.3d 891, 896.) The only reasonable construction is that the fear experienced by the threatened person may be for herself, or for members of her family, or both.

Defendant's construction of the statute removes the statutory protection of section 422 whenever the threatened person is put in fear, not for herself but solely for her family, is unreasonable and

1    renders the word "or" nugatory. (E.g., CalBeach Advocates v.. City
     of Solana Beach (2002) 103 Cal.App.4th 529, 537.)

2

3    Because section 422 is not ambiguous, and defendant's competing
     construction is unreasonable in that it renders a portion of the
     statute nugatory, the rule of lenity (People v. Hill, supra, 37
4    Cal.App.4th at p. 226) does not apply and defendant is not entitled
     to the construction of the statute most favorable to him.

5

6    Finally, given the statutory language, because J.W. was the "person
     threatened" by defendant, the record need not contain substantial
     evidence that *her family members* were also threatened, or that
7    defendant *intended* for them to feel threatened. Nor was he entitled
     to an instruction requiring the jury to consider the issue.

8

9    (People v. Brown, 2007 WL 2687595, at *5-7.)

10          At the outset, the undersigned acknowledges, as did the California Court of

11   Appeal, the variance between the amended information and the proof.  The amended information

12   alleged that petitioner threatened to commit crimes which would result in death and great bodily

13   injury to the victim.  (CT at 220, 221.)  However, the evidence presented at trial demonstrated

14   that petitioner threatened to cause death and great bodily injury to the victim's family.  The

15   California Court of Appeal found that any issue regarding this variance was waived.  In any

16   event, in the instant petition, petitioner does not raise a claim regarding the variance between the

17   information and the evidence produced at trial.[2]

18   _____

19        [2]  Were petitioner to raise a claim alleging that his right to present a defense was violated
     by the variance, the undersigned would reject this claim because petitioner has demonstrated no
20   prejudice from this variance.  Berger v. United States, 295 U.S. 78, 81-82 (1935) (the inquiry is
     whether the variance in proof has affected the substantial rights of the accused); see also Lincoln
21   v. Sunn, 807 F.2d 805, 813 (9th Cir. 1987)(the appellant must demonstrate that he was
     prejudiced by the variance such that he was denied sufficient notice of the offense to permit him
22   to prepare adequately and present his defense). Petitioner does not claim, for example, that based
     on the variance he was unable to present an adequate defense.

23
          Were petitioner to raise a claim alleging jury instruction error regarding the criminal
24   threat charges, the undersigned would reject such a claim.  Although the instructions were
     initially somewhat confusing as they stated that petitioner had to have threatened the victim, as
25   opposed to her family, the trial court cured this confusion by giving the supplemental instruction
     in response to the jury's question.  It is clear that the jury understood that the criminal threat
26   charges were based on the threats made by petitioner to the victim regarding her family.  A claim

1    Petitioner is arguing that there was insufficient evidence to support his conviction

2 for making criminal threats because there is no evidence that the victim communicated these

3 threats to her family.  The California Court of Appeal found that California Penal Code § 422

4 does not require that the victim communicate the threats to her family: "The only reasonable

5 construction [of Penal Code § 422] is that the fear experienced by the threatened person may be

6 for herself, or for members of her family, or both."

7    Federal courts reviewing state convictions are bound to accept a state court's

8 interpretation of state law unless that interpretation is "untenable or amounts to a subterfuge to

9 avoid federal review of a constitutional violation."  See Oxborrow v. Eikenberry, 877 F.2d 1395,

10 1399 (9th Cir. 1989); see also Mendez v. Small, 298 F.3d 1154, 1158 (9th Cir. 2002) ("A state

11 court has the last word on the interpretation of state law.").  The California Court of Appeal's

12 finding that Cal. Penal Code § 422 requires that the fear experienced by the threatened person

13 may be for himself or for family members, and does not require that the threatened person

14 communicate the threat to the threatened family members, is not a subterfuge to avoid federal

15 review.  This undersigned must defer to the state court's interpretation of this state law.

16    Petitioner also argues that there was insufficient evidence that he intended for the

17 victim to her inform her family of the threats.  As discussed above, communication of the threats

18 to the victim's family is not an element of California Penal Code § 422.

19    Accordingly, for the reasons discussed above, the undersigned finds that the

20 denial of these claims by the California Court of Appeal was not an unreasonable application of

21 clearly established Supreme Court authority.

22 ////

23 ////

24

25 by petitioner challenging these jury instructions would fail as no violation of fundamental
fairness occurred.  See Estelle, 502 U.S. at 72 (to receive federal habeas relief for an error in jury
instructions, petitioner must show that the error so infected the entire trial that the resulting

26 conviction violates due process); see also Henderson v. Kibbe, 431 U.S. 145, 154 (1977).

V.  <u>Conclusion</u>

For all of the above reasons, the undersigned denies petitioner's application for a writ of habeas corpus.

Before petitioner can appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. Fed. R. App. P. 22(b).

For the reasons set forth above, the undersigned finds that petitioner has not made a showing of a substantial showing of the denial of a constitutional right.

Accordingly, IT IS HEREBY ORDERED that:

1.  Petitioner's application for a petition for writ of habeas corpus is denied; and

2.  A certificate of appealability is not issued in this action.

DATED:  February 28, 2011

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

br774.157